UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 07-20389-CIV-MARTINEZ-BANDSTRA

| | |
|---|---|
| COFFEE BEAN TRADING-ROASTING, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>COFFEE HOLDING, INC., a Nevada corporation,<br><br>Defendant. | Case No. 07-20389 |

## AFFIDAVIT OF ANDREW GORDON IN OPPOSITION TO MOTION FOR TRO AND IN SUPPORT OF MOTION TO CHANGE VENUE.

STATE OF NEW YORK )
                           ) ss:
COUNTY OF KINGS )

ANDREW GORDON, being duly sworn, deposes and says:

1. I am the president of Defendant Coffee Holding Co., Inc., a Nevada corporation and have personal knowledge of the facts stated herein. I strongly disagree with the factual allegations contained in the Complaint and in the affidavit of Ernesto Aguila.

2. Café La Rica is a Delaware limited liability company with 2 members---the plaintiff and the defendant in this case. Plaintiff is also a Delaware limited liability company. Article XIV, Section 14.8 of the Limited Liability Company Agreement between the members provides that "This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles thereof. To the fullest extent permitted by law, the parties hereto hereby (i) submit to the jurisdiction of the state and

federal courts located in the State of Delaware for purposes of any legal action or proceeding brought under or in connection with this Agreement, (ii) agree that exclusive venue of any such action or proceeding may be laid in the State of Delaware and (iii) waive any claim that the same is an inconvenient forum." This case should be removed to the District of Delaware.

3. This lawsuit is a desperate attempt by Plaintiff to salvage a venture that has been a dismal failure almost since inception leading to my letter of February [5], 2007 dissolving the LLC. Café La Rica has accumulated some $430,000 in losses since inception and has never been able to operate at a positive cash flow. Coffee Holding has sold some $530,000 in coffee to Café La Rica since March 2006. During this time, Coffee Holding has been paid only some $150,000 by Café La Rica and is owed some $410,000 for coffee sales and expenses. All of this amount is long overdue as Café La Rica was required to pay for coffee it received from Coffee Holding within 15 days of the end of each month pursuant to Section 2 of the Expense Sharing Agreement between Coffee Holding and Café La Rica. This key fact is left out of Plaintiff's pleadings---repeatedly.

4. At no time did Coffee Holding "overcharge" Café La Rica for coffee sales. At no time did Coffee Holding bill Café La Rica for coffee it did not ship. Instead, Coffee Holding has continually funded Café La Rica's operations by contributing $250,000 in cash and equipment with a book value exceeding $335,000 in March of 2006 and an additional $50,000 in working capital into Café La Rica in December, 2006. Coffee Holding also advanced a $19,000 security deposit for Café La Rica's leased premises which has not been reimbursed and is owed $20,000 for an insurance premium paid by Coffee Holding on behalf of Café La Rica. To my knowledge, plaintiff has never contributed any cash or coffee to Café La Rica.

5. Café La Rica's financial woes are squarely attributable to management miscues by Ernesto Aguila and the neglect and indifference of plaintiff. For example, immediately upon the company's inception, Mr. Aguila leased an expensive Chrysler 300 at nearly $700 per month and charged it to the company. In addition, Mr. Aguila fired key employees and replaced them with family members including his wife Sonia Aguila at a salary of over $40,000 annually. Lastly, Mr. Aguila was in charge of all coffee purchases and sales---[nearly 50% of which were purchased from suppliers other than Coffee Holding.] Attached as Exhibit A are many emails between Mr. Aguila and Coffee Holding by which Mr. Aguila is ordering coffee. All of Mr. Aguila's emails are signed "Chief Executive Officer Café La Rica" so the assertion that I was in "full control" of Café La Rica is nonsense. These emails, going back over a seven(7) month period prove that Mr. Aguila was repeatedly demanding coffee from Coffee Holding. For example, on December 22, 2006, Mr. Aguila wrote: "I need this coffee (120 bags) here by Tuesday no later than Wednesday next week." On December 13, 2006 Mr. Aguila wrote: "I will need additional 50 bags of Colombians:" On December 12, 2006, Mr. Aguila wrote: "The total coffee that I need is as follows" and he listed some 96,000 pounds of coffee. On December 7, 2006 Mr. Aguila wrote: "Just get me what he has I need it bad." On September 22, 2006 Mr. Aguila wrote: "we are in need of brazils, Colombians, and Viets. We always close out the month with large production. This week alone we are going to need around 20,000 lbs of green coffee." On August 22, 2006 Mr. Aguila wrote: "I only need a couple of pounds this week." On July 7, 2006 Mr. Aguila detailed Café La Rica's coffee needs in another email to Coffee Holding. Mr. Aquila's own emails contradict the allegations that "Coffee Holding unilaterally permitted balances to build up" "and never consulted with anyone at Cafe La Rica with respect to , its purchases of coffee from itself on behalf of Cafe La Rica." Likewise attached as Exhibit B are

the financial reports for November and December 2006 that were provided to Mr. Aguila. These show losses in both months and accumulated losses for 2006 of over $430,000. These financials, as well as the substantial debt to Coffee Holdings and lack of capital at Café La Rica show that the company is not a "successful business" as claimed by Mr. Aguila.

6. Mr. Aguila unilaterally changed the passcodes on the bank account of Café La Rica effectively excluding me from Café La Rica's account and putting them under his sole control. Mr. Aguila also withdrew at least $20,000 from that account after receiving the notice of dissolution. I have also been unable to access the security cameras monitoring Café La Rica's premises since the dissolution notice was sent. As these acts were inconsistent with dissolution, as well as good faith and a change of prior practice, I notified Washington Mutual to preserve assets of Café La Rica so they would not be dissipated. I was contacted by 2 suppliers of Café La Rica. I made no attempts to contact any suppliers and have had no contacts with Café La Rica's customers, employees, landlord or potential investors in Café La Rica. For example, Coex Coffee intermittently contacts me about Mr. Aguila of their receivable from Café La Rica. We did not discuss any potential investment in Café La Rica.

7. Mr. Aguila's actions pose a significant irreparable economic threat to Coffee Holding and the other creditors of Café La Rica. Café La Rica has no working capital and is not operating cash-flow positive. Dissolution and winding up Café La Rica will minimize the risk to all creditors that Mr. Aguila will continue to waste the assets of Café La Rica. It is unfortunate that the venture has not made money and Coffee Holding cannot continue to subsidize the losses forever.

Dated: February 16, 2007

_____
ANDREW GORDON

Sworn to before me on this
16th day of February, 2007

_____
NOTARY PUBLIC

Sworn to before me on this
16th day of February, 2007

_____
NOTARY PUBLIC

GERARD DeCAPUA
Notary Public, State of New York
No. 02DE4860807
Qualified in Kings County
Commission Expires May 5, ~~14~~ 2010

- 5 -